UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                                                CASE. NO.  24-20555

        Plaintiff,

v.                                     HON. Stephen J. Murphy

ABEL ARANDA,

        Defendant.

_____/

## ABEL ARANDA'S SENTENCING MEMORANDUM

      There are an infinite number of emotions that can swell in response to being caught committing a crime: fear, denial, panic. When Aranda was caught trying to take drugs on a plane, the overwhelming emotion he felt was something different. It was relief. Aranda's arrest did something he could not do for himself: it interrupted a worsening spiral of addiction in a very young man who had no prior contact with the criminal justice system. His decision to take drugs onto a plane was undeniably wrong, but it was also the action of someone in distress—not someone pursuing crime as a way of life. Sentencing now presents an opportunity to guide him toward recovery at a moment when he is ready to accept help. Where the low end of the guidelines already falls near the statutory mandatory minimum, Aranda knows he will be subject to at least 60 months in prison, ample time for him to receive treatment and rehabilitation.

Pursuant to the § 3553 factors, Aranda respectfully requests that you sentence him to the minimum of 60 months.

## I. The Law

In reaching this decision, it is crucial that judges give careful consideration to every minute that is added to a defendant's sentence, as explained by the District Court in *United States Faison*, 2020 WL 815699, at *1 (D. Md. Feb. 18, 2020) (Hazel,J.):

> During the sentencing hearing, the lawyers and the judges discuss the appropriate sentence, often at great length, but after the judge announces a decision, that judge, the lawyers, and the staff move on to the next case; the hearing and outcome soon fade into distant memory. Meanwhile, for the defendant, the torture of a monotonous existence begins, while life for his family moves forward without him. For him, every day, month, and year that was added to the ultimate sentence will matter. The difference between ten and fifteen years may determine whether a parent sees his young child graduate from high school; the difference between ten and fifteen months may determine whether a son sees his sick parent before that parent passes away; the difference between probation and fifteen days may determine whether the defendant is able to maintain his employment and support his family. Thus, it is crucial that judges give careful consideration to every minute that is added to a defendant's sentence. Liberty is the norm; every moment of incarceration should be justified.

## II. The 3553(a) factors favor the mandatory minimum
### a. Abel Aranda is so more than his offense suggests

If life were a race, Abel Aranda's childhood would have left him starting from well behind the starting line. He was born to Abel and Anna Aranda, who were married

at the time of Aranda's birth. The marriage didn't last long, a product of instability in the home on his mother's end, including infidelity in the marriage. His mother's behavior continued to become more erratic during Aranda's childhood. After his parents split, Anna only saw her children sporadically. And worse, she died of cervical cancer when Aranda was only ten years old. By then, she was living in Tijuana, Mexico. Aranda was left without many memories of his mother. The loss of Aranda's mother left a difficult stain on Aranda's childhood. He wished he could have his mother. He wished that she hadn't passed under the circumstances she did. Her absence left him depressed at an age when he was too young to understand his own emotions.

Aranda's father remarried, but Aranda struggled to have a positive relationship with his new stepmother. It got so bad that they could not share the same home, and despite her marriage to Aranda's father, she was living in a separate apartment.

His complicated relationship with his father and stepmother made it hard to speak out when Abel was sexually assaulted by his father's friend. As a result of the sexual abuse, Abel started to suffer from serious mental health issues. He was just a child, and yet struggling with depression, anxiety, guilt, shame, and all the horrible feelings associated with keeping a secret about sexual abuse. As a result of his early ADHD diagnosis, he did have the benefit of occasional therapy and anxiety medications. But the drugs he was prescribed, including Adderall, did little to address the root of his mental health issues.

Abel began to cope in the way that many naïve children do—self-medication. He

3

was only 13 when he first tried alcohol, and prior to this offense, he was spending half of his paycheck on beer. Likewise, he was only 13 when he first tried marijuana. And horrifyingly, he was only 13 when he first tried cocaine. His legally prescribed Adderall was a steppingstone for eventual experimentation with methamphetamine. Aranda was using methamphetamine at the time of the offense.

Fortunately, Aranda has strong support of his family. He has two sisters, Anabel and Stephanie, both of whom remain supportive of him. Aranda currently lives with Anabel, and the two remain close as ever. He also has the strong support of his father and stepmother. Despite their fraught relationship early on, Aranda is aware that much of the tension with his stepmother stemmed from his own depression and anxiety, and the two share a close bond now.



*Left: Aranda, at the top and middle, surrounded by his sisters and extended family.*

This is not a story seeking pity, but one of redemption. Since his placement on bond in October of 2024, Abel has meaningfully participated and benefitted from mental health and substance abuse treatment with Legacy Behavioral Adult Services in Bakersfield,

4

California. He received treatment for ADHD, anxiety, and depression, and takes the medications noted in the PSR as prescribed. Aranda describes a positive relationship with his treatment provider and is optimistic about receiving continued treatment as he learns to navigate the world through a sober lens.

### b. The nature of the offense has mitigating facts that support the low end of the guidelines

On June 29, 2023, Homeland Security Investigations ("HSI") received information that Aranda may be trafficking drugs through the Detroit Metropolitan Airport. Officers confirmed that Aranda had a one-way flight to Raleigh with a short layover in Detroit. HSI came prepared with a K-9 officer, and the dog alerted to two bags associated with Aranda.

Officers approached Aranda at the airport. Aranda cooperated with their questions, providing his identification and flight documentation. He confirmed that the suitcases were his and even consented to a search of his checked bags, knowing that officers were sure to discover contraband. Upon search of the bags, officers found eight brick-shaped packages. Lab analysis confirmed that the packages contained cocaine.

Aranda was arrested and interviewed. He truthfully told officers that, while working in the grape fields, he was approached about making some easy money. Aranda could not identify who got him involved, but he provided information about how much he was paid, and how many trips he made. Aranda was released pending prosecution. He was not charged until over a year later.

This case involves the trafficking of cocaine, which is serious. But there are mitigating facts. The case does not involve violence, assaultive behavior, or any victims. The case does not involve the trafficking of firearms, or the possession, brandishing, or use of any firearms. And Aranda did not resist arrest, instead politely answering officers' questions at the time of his arrest. Aranda was let go after questioning without being arrested and was not charged until a year later, during which Aranda committed no similar crimes.

Aranda's age at the time of the offense, 23, is a mitigating fact. The Supreme Court has acknowledged "what 'any parent knows'" and what research has shown time and time again: juveniles and young adults are different.[1] "[D]evelopments in psychology and brain science continue to show fundamental differences between juvenile and adult minds"—for example, in "parts of the brain involved in behavior control."[2] Specifically, the prefrontal cortex of the brain does not reach "full adult maturity" until "the early to mid-20s," and this part of the brain controls impulse control, complex decision-making, inhibition, and planning. (Ex. A, Keating Summ., at 3.) This is why young people have a difficult time adjusting risky behavior after they have begun. (*Id.* at 3-4.) The immature brain and hormonal imbalances lead young people "to focus more on the benefits of risky behavior than on the possible negative consequences of their actions." (*Id.* at 5.)

---

[1] *Miller v. Alabama*, 567 U.S. 460, 471 (2012).
[2] *Id.* at 471-72 (cleaned up).

For these reasons, the Supreme Court acknowledged young people lack maturity and have "an undeveloped sense of responsibility, leading to recklessness, impulsivity, and heedless risk taking."[3] They are also "more vulnerable to negative influences and outside pressures, including from their family and peers."[4] Critically, their characters are "not as well formed as an adult's" because their "traits are less fixed and [their] actions less likely to be evidence of irretrievable depravity."[5] At this age, Aranda was susceptible to faulty thinking and less than fully capable of regulating impulse control or risk-seeking behavior. The juxtaposition between his lack of criminal history and his conduct show that risk-seeking behavior that is not nuanced or well-thought out. Aranda is a young man with potential for growth, and that should be acknowledged.

### c. 60 months is just punishment for the offense, reflects the seriousness of the offense, and would place Aranda among similarly situated defendants.

60 months is just punishment and reflects the seriousness of the offense, especially given Aranda's role in the offense and lack of criminal history. This is especially true given that there is no indication that Aranda had any managerial role in the trafficking operation, or that he was anything other than a simple drug mule.

60 months is the bare minimum. Aranda has no chance at probation despite not having any serious criminal history. Despite having never been to prison before. Despite

---

[3] *Id.* at 471 (cleaned up).
[4] *Id.* (cleaned up).
[5] *Id.* (cleaned up).

7

never having spent more than a day or two in jail. Given his total naivety and unfamiliarity with the criminal justice system, a 60-month sentence in a federal prison will be a traumatic shock to Aranda's system. It will be life changing, for better and for worse. That is just punishment enough.

A look at the data in this district shows that a 60-month sentence both reflects a just punishment, as well as puts Aranda among similarly situated defendants. The United States Sentencing Commission, for one, tracks the average and median sentence lengths for defendants like Aranda. The data shows that between 2020 and 2024, in the Eastern District of Michigan, there have been 63 cases where the defendant was sentenced with the shared characteristics: (a) Sentenced for trafficking powder cocaine in particular (b) with §2D1.1 used as the primary sentencing guideline and (c) a Criminal History Category of I. The results are notable:



Of the 63 cases with those same characteristics as in this case, the average sentence length over the last five years in this district is just 46 months. This is especially notable given the fact that most of these defendants would not have had the benefit of the zero-point offender downward adjustment, pursuant to §4C1.1, as that provision was only implemented in November of 2023. The data suggests that many of these defendants will have qualified for Safety Valve or a "5K," and received a sentence well below their guidelines. Where Aranda does not qualify for either, he is already subject to 60 months, a sentence 14 months higher than the average in this district. Any sentence above 60-months, then would expose Aranda to a sentence far beyond what is necessary for the purposes of §3553(a).

### d. A 60-month sentence protects the public.

Both the facts of this case and Aranda's conduct since his arrest suggest that even a 60-month sentence protects the public.

First, consider the facts. The case does not involve violent or assaultive behavior. Though the crime is serious, there is nothing to suggest that Aranda was anything other than a mule, the lowest on the totem pole of the criminal scheme. The case involves no gun possession or firearms trafficking. Importantly, HSI must have concluded that Aranda was no threat to the public, as they made a decision to release him pending prosecution without an arrest. And the Government must not have seen Aranda as any serious threat to the public, as they waited over a year to indict him for the offense. And

9

upon initial appearance in Michigan, Aranda was recommended for pretrial release and given a bond without a contested hearing. All of these facts signal that Aranda is no threat to the public.

His conduct, his since placement on bond confirms that the public is already protected. Since being placed on bond, Aranda has had no other contact with law enforcement. There is no suggestion that he has been involved in criminal conduct similar to the offense of conviction. Aranda has substantively complied with all of his bond conditions, as well. He has admittedly drank alcohol on some occasions, in violation of his conditions, but that is the worst of his conduct. In total, it has been nearly three years since his initial arrest in June of 2023, without any serious convictions in the meanwhile.

While on pretrial release, Aranda has even gone above and beyond to resolve his old outstanding warrant for—what ultimately—is a conviction for reckless driving. PSR ¶37. Aranda proactively sought approval to leave the district to appear in Nevada to resolve the old case. As part of his conditions of probation on that case, he successfully completed DUI school, a victim impact panel, and 46 hours of community service. He did this while on bond for this offense. The public is protected.

### e. 60 months serves as an adequate deterrent.

General deterrence "occurs when the decision maker contemplates the

punishment experiences of others."[6] Consequently, general deterrence "does not concern a 'connection' between behavior and consequences, but whether potential consequences already recognized by the decision maker seem sufficiently 'costly' to deter behavior."[7]

Research shows that the "conforming influence" of extralegal consequences attendant to indictment and prosecution (shame, fear of peer disapproval, embarrassment, and social stigma) are far more effective than actual punishment in fostering general deterrence.[8] Even the Department of Justice recognizes that "[t]he certainty of being caught is a vastly more powerful deterrent than the punishment."[9] What this means is that the real fear of being caught, the shame of admitting guilt, and the social stigma of prosecution, are all the preventative aspects of deterrence. Not what happens to a stranger who is caught and subsequently punished.[10]

---

[6] Daniel S. Nagin & Greg Pogarsy, *Integrating Celerity, Impulsivity, an Extralegal Sanction Threats into a Model of General Deterrence*, 39 CRIMINOLOGY 865, 867 (2001).
[7] *Id.*
[8] *Id.* at 869.
[9] NAT'L INSTITUTE OF JUSTICE, *Five Things About Deterrence* (Jun. 5, 2016), *available at* https://nij.ojp.gov/topics/articles/five-things-about-deterrence (last accessed October 23, 2025).
[10] Valerie Wright, Ph.D.: *Deterrence in Criminal Justice: Evaluating Certainty vs. Severity of Punishment,* THE SENTENCING PROJECT (Nov. 2010), *available at* http://www.antoniocasella.eu/nume/Wright_2010.pdf. (Last accessed on October 23, 2025)

In this context, a 60-month sentence provides general and specific deterrence. Any person that learns of Aranda's case will learn that his behavior means incarceration for at least five years, regardless of whether the person has criminal history or not. Even the most sympathetic defendant must serve a half-a-decade sentence in prison, depriving them of any ability to work, deprive them of being able to provide for their families, and stigmatizing that person for the rest of their life. Aranda, who is already overwhelmed with guilt and shame about how his conduct has affected his family, is already deterred from engaging in conduct like this ever again.

    **f. 60 months gives Aranda ample time to participate in meaningful rehabilitation**

60 months will give Aranda ample time to participate in meaningful treatment. Fortunately for Aranda, his crime of conviction does not disqualify him from participation in RDAP, and Aranda looks forward to participating in an intensive residential treatment for his history of substance abuse. Aranda also intends to participate in cognitive behavioral therapy courses and as noted in the PSR at Paragraph 22, his primary goal is to "Focus on a GED, doing the right thing and getting out."

**III.  Conclusion**

Abel Aranda is so much more than what he has been convicted of, and this Court must do what the Guidelines cannot: it must look beyond the mechanical calculation of criminal history and offense conduct and consider Aranda's conduct in the context of his traumatic life experiences, his youth, and his potential for growth. The statutory

mandatory minimum already exceeds what is "sufficient but not greater than necessary" for the purposes of 18 U.S.C. § 3553(a). For the foregoing reasons, the Court should impose the mandatory minimum sentence of 60 months.

                                        Respectfully,

                                        s/ Daniel S. Dena
                                        Daniel Sebastian Dena
                                        Counsel for Abel Aranda
                                        FEDERAL COMMUNITY DEFENDER
                                        613 Abbott St., Suite 500
                                        Detroit, MI 48226
                                        T: (313) 980-2328
Dated: January 13, 2026            E: Daniel_Dena@fd.org